**In re PARMALAT SECURITIES LITIGATION.**

**Enrico Bondi, Plaintiff,**

v.

**Bank of America Corporation, et al., Defendants.**

**Nos. 04 MD 1653(LAK), 05 CIV.4015(LAK).**

United States District Court, S.D. New York.

Jan. 31, 2006.

John B. Quinn, Loren Kieve, Michael B. Carlinsky, R. Brian Timmons, Quinn Emanuel Urquhart Oliver & Hedges LLP, New York City, for Plaintiff.

A. Robert Pietrzak, Thomas McC. Souther, Daniel A. McLaughlin, Joseph B. Tompkins, Jr., Alan C. Geolot, Mark P. Guerrera, Sidley Austin Brown & Wood LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Enrico Bondi has served since December 2003 as the Extraordinary Commissioner of Parmalat Finanziaria S.p.A., Parmalat S.p.A., and 21 affiliated entities (the "Parmalat Debtors") in the Italian reorganization proceedings known as Extraordinary Administration.[1] His position is roughly equivalent to that of a chapter 11 bankruptcy trustee in the United States. In the First Amended Complaint (the "FAC"), he alleges in substance that Bank of America Corporation and affiliates[2] (collectively "BoA" or the "Bank") structured transactions that operated to defraud the Parmalat Debtors and their affiliates (collectively "Parmalat" or the "Company") by permitting corrupt insiders to loot the companies with impunity. The Bank moves to dismiss Counts Eleven,

---

1. *See Bondi v. Bank of Am. Corp.,* 383 F.Supp.2d 587, 589 (S.D.N.Y.2005) (*"Bondi II "*) (citing *Bondi v. Grant Thornton Int'l,* 322 B.R. 44, 45–46 (S.D.N.Y.2005) (*"Bondi I "*); *In re Parmalat Finanziaria S.p.A.,* 320 B.R. 46, 47–48 (S.D.N.Y.2005); Joint Report on the Status of Proceedings in Italy (Jan. 18, 2005) (04 MD 1653, docket item 47)).

2. The defendants are Bank of America Corporation, Bank of America National Trust & Savings Association, Banc of America Securities, LLC, Bank of America International, Ltd., Banc of America Securities Limited, and Bank of America, N.A. *See* FAC, ¶¶ 22–27.

Twelve, and Thirteen of the FAC for failure to state a claim.

### I. The Original Complaint

The original complaint described how "Parmalat engaged in a massive fraud and [how] BoA assisted in some respects."[3] More particularly, BoA helped Parmalat and its managers structure and execute "a series of complex, mostly off-balance sheet, financial transactions that were deliberately designed to conceal Parmalat's insolvency."[4] Through the Bank's assistance, Parmalat presented false financial statements and the managers continued to raise additional financing for "(a) their massive acquisition campaign, (b) their equally massive looting of the company, and (c) their effort to keep the company afloat amid a mounting wave of losses, debts and disappearing funds."[5] The eventual result of this scheme was Parmalat's bankruptcy.[6]

The original complaint alleged numerous claims against BoA, including, *inter alia*, fraud, negligent misrepresentation, aiding and abetting breach of fiduciary duty, diversion of corporate assets, unjust enrichment, civil conspiracy, federal Racketeer Influenced and Corrupt Organizations ("RICO") claims, and North Carolina RICO Act claims. On BoA's motion to dismiss for failure to state a claim, the Court held that the doctrine of *in pari delicto* barred recovery by Bondi from BoA "except to the extent that the complaint alleges that BoA aided and abetted a breach of the Parmalat insiders' duties to the Company" because the original complaint's detailed allegations made it "quite clear that the Parmalat entities were crucial actors in the[ ] transactions."[7] Bondi's argument that the true culprit was not Parmalat but the group of corrupt insiders was "of no avail," as the law of agency required that

> "even where the complaint speaks of Parmalat's insiders rather than Parmalat, the relevant actions and conduct must be imputed to the Company to the extent that the complaint makes clear that the agents were acting for the Company as well as themselves ... the Court is obligated to read the complaint as a whole ... The gravamen of this complaint [ ] is a claim that the Bank is liable for its role in a series of specific transactions. These transactions all were obviously the business of, and intended to benefit, Parmalat and not just its agents."[8]

The insiders' knowledge of the transactions therefore was imputed to Parmalat. Finally, because "theft from a corporation by insiders is self dealing by the insiders and not in any sense in the interest of the entity," *in pari delicto* did not apply to the extent that the original complaint alleged that BoA assisted the insiders in looting Parmalat.[9]

Most of the original complaint was dismissed accordingly.[10] While the *in pari delicto* doctrine barred the federal and North Carolina RICO claims, those claims

---

3. *Bondi II*, 383 F.Supp.2d at 596.

4. Original Cpt, ¶ 1.

5. *Id.*, ¶ 204.

6. *Id.*, ¶ 75.

7. *Bondi II*, 383 F.Supp.2d at 596.

8. *Id.* at 597–98.

9. *Id.* at 599.

10. *Id.* at 606 ("BoA's motion to dismiss is granted to the extent that Counts One, Two, Three, Five, Six, Seven, Eight, Ten, Eleven and Twelve, Count Nine except insofar as it rests on allegations that Parmalat insiders looted the Parmalat Debtors, and so much of Counts Four and Nine as assert claims or seek recovery on behalf of Parmalat's creditors, are dismissed. The motion is otherwise denied.").

were defective also because Parmalat's own participation in the fraud and the imputed knowledge of the insiders precluded reasonable reliance.[11] Further, the original complaint failed properly to allege racketeering activity with particularity.[12] Leave to amend was granted only with respect to the federal and North Carolina RICO claims.[13]

## II. The First Amended Complaint

Although the alleged transactions themselves are not significantly different, the FAC tells a different story as to the motivations and actions of the main players. The thrust of the FAC, the well-pleaded factual allegations of which are presumed true for purposes of this motion, is that BoA made it possible for Parmalat's corrupt managers and directors to loot the Company by designing a series of financial transactions "to make them appear to be something other than they were."[14] The Bank "structured a series of sham transactions" with the intent to "raise ever increasing amounts of financing [for Parmalat] while perpetuating the impression that the company was financially sound."[15] In contrast to the original complaint, the FAC alleges that Parmalat itself did not benefit from the sham transactions:

> "The only benefit was to [Parmalat's] corrupt managers who could use the transactions to make it appear that Parmalat was creditworthy, when in fact it was not. This enabled them to keep Parmalat afloat, while they continued to loot it . . . As a result of [BoA's] knowing assistance, the corrupt managers were able to continue their embezzle-

ment scheme while concealing Parmalat's deepening insolvency directly resulting from that scheme."[16]

## A. Specific Transactions

### 1. December 1996 Loan to Parmalat Argentina [17]

BoA loaned $60 million to Parmalat Argentina, guaranteed by Parmalat SpA, but a side letter concealed the actual interest rate, making it appear that the loan terms were typical of a healthier company. The transaction was a rollover of debt by the corrupt insiders. In October 1997, BoA facilitated a $150 million private placement by Parmalat Trust, the proceeds of which were used to pay off this $60 million loan.

### 2. December 1997 Credit Agreement with Venezuelan Subsidiary [18]

On December 16, 1997, BoA entered into an $80 million five-year credit agreement with one of Parmalat's Venezuelan subsidiaries. A side letter gave BoA additional guarantees, a $120,000 "arrangement fee," and interest beyond the publicly-disclosed rate. Again the proceeds were used to roll over maturing loans into new ones, which hid "the deteriorating credit and poor liquidity of Parmalat and its subsidiaries, caused by the managers' looting scheme."[19]

### 3. September 1998 Loans Secured by Cash Raised Through Private Placements of Debt [20]

On September 29, 1998, BoA entered into an $80 million eight-year credit agree-

11. *Id.* at 604.

12. *Id.*

13. *Id.* at 606.

14. FAC, ¶ 2.

15. *Id.,* ¶ 78.

16. *Id.,* ¶¶ 80, 85.

17. *Id.,* ¶¶ 87–109.

18. *Id.,* ¶¶ 110–125.

19. *Id.,* ¶ 124.

20. *Id.* ¶¶ 126–158, 159–177.

ment with two of Parmalat's Venezuelan subsidiaries and a $100 million credit agreement with a Brazilian subsidiary. The loans were secured by cash deposits made by Eurofood IFSC Limited ("Eurofood"), an Irish Parmalat subsidiary, in the entire amounts of the respective loans. Eurofood obtained the funds by issuing eight-year notes to institutional investors in the United States in private placements arranged by BoA. In other words, the flow of funds in substance was from the investors to the South American subsidiaries so that, despite contrary appearances, BoA had no risk. When Parmalat's troubles came to light in December of 2003, BoA foreclosed on the collateral for the loan to the Venezuelan subsidiaries.

The fact that Parmalat put up cash to secure the loans was not disclosed publicly. Consequently, the purchasers of the eight-year notes did not know that they really were contributing collateral for BoA loans. Nor did the purchasers of Parmalat's publicly-traded securities or its innocent managers know that Parmalat had approximately $180 million less available cash than its financial statements indicated. Side letters that increased the fees and interest payable to BoA also were not disclosed, thus further distorting Parmalat's financial picture. In addition, the actual purpose of the Venezuela loans was to extinguish debt under the December 16, 1997 agreement, rather than to fund import/export activities by the Venezuelan companies, as suggested by the public disclosure.

### 4. October 1999 Credit Agreement with Mexican Subsidiary [21]

On October 12, 1999, BoA entered into a $25 million credit agreement with a Mexi-

can subsidiary of Parmalat. Once again, the loan was collateralized with approximately $25.5 million in cash deposited by a Parmalat entity. The FAC alleges a complicated series of transfers, with the ultimate result that the money moved from one Parmalat entity to another. BoA had no exposure but received an annual interest spread and fees. In December of 2003, the Bank foreclosed on the collateral.

### 5. $300 Million Equity Investment in Administracao [22]

In a complex series of transactions, and to further the "large scale embezzlement scheme," [23] BoA arranged for $300 million of privately-placed debt issued by a Brazilian Parmalat subsidiary to be disguised as an equity investment. BoA created two special purpose entities (SPEs) that purchased $300 million worth of stock, an eighteen percent stake, in Parmalat Administracao S.A. ("Administracao"). In turn, the SPEs issued four-year notes that then were purchased by BoA, institutional investors in the United States, and another Parmalat subsidiary. $288 million of those funds eventually "found their way to Wishaw Trading SA, a Uruguayan shell entity controlled by the Tanzi family." [24] Parmalat's press release used language suggested by a BoA official to describe the debt used to acquire the shares in Administracao as an equity investment. The appraisal value of Administracao used in the press release, denominated in dollars, was inappropriately high, in part because the parties used an old report prepared before the Brazilian currency was devalued. The sale allowed Parmalat's corrupt insiders to keep eighteen percent of Administracao's losses off of Parmalat's books, which made it appear that it had less debt.

---

**21.** *Id.,* ¶¶ 178–187.

**22.** *Id.,* ¶¶ 188–233.

**23.** *Id.,* ¶ 190.

**24.** *Id.,* ¶ 210. Calisto Tanzi is the former CEO and President of Parmalat. *Id.,* ¶ 72.

In September 2001, Parmalat gave the SPEs put options that gave them the right to sell the Administracao shares for amounts that would retire the notes. When Parmalat's troubles came to light, BoA attempted to exercise the puts. BoA then forced the SPEs and a Parmalat entity into liquidation proceedings in the Caymans, allegedly to frustrate Bondi's restructuring efforts and an investigation of BoA's officials.

### 6. *July 2001 $45 Million Loan to Indulac* [25]

On July 13, 2001, BoA entered into a $45 million five-year loan to Indulac, a Venezuelan entity. A side letter provided for higher fees and interest rates for BoA. The funds were used by Indulac to pre-pay partially a 1998 $100 million loan by BoA to Indulac and Parmalat Venezuela, which is alleged to have allowed Parmalat's corrupt managers to "hide the fact that Parmalat had no funds to repay maturing loans." [26] BoA was thus able to refinance this loan at a higher interest rate. Further, through an interest rate swap agreement with Indulac which provided an advance to pay premiums on a credit risk insurance policy, BoA was able to divert $2 million in kickbacks for itself.

### 7. *December 2001 Credit and Interest Rate Swap Agreements with Chilean and African Parmalat Subsidiaries* [27]

Under a set of agreements dated December 14, 2001, BoA made a series of loans to three Parmalat subsidiaries—$25 million to "Parmalat Chile," $20 million to "Parmalat South Africa," and $15 million to "Parmalat Africa." At the same time,

BoA and Parmalat Africa signed what purported to be an interest rate swap agreement, which effectively required that BoA pay $5.2 million each year to a Swiss bank account ostensibly owned by Parmalat Africa. Side letters required Parmalat Chile and Parmalat South Africa to pay BoA additional interest on their loans approximately equal to BoA's annual $5.2 million payments to Parmalat Africa's ostensible bank account. The account, however, actually was controlled by BoA. Moreover, the swap agreement was not in actual substance a swap, as it provided "no currency or interest rate exchanges and offered the counterparties no ability to hedge." [28] In other words, the agreements were a device for Parmalat to make illicit payments to BoA officials "for assisting culpable managers in their massive looting of Parmalat." [29]

In August 2003, BoA asked Parmalat to guarantee the $60 million of credit extended under the December 14, 2001 agreements and since then has attempted to foreclose on the loans and threatened to force insolvency proceedings in the relevant countries.

### 8. *December 2001 $80 Million Loan Secured by Funds Raised Through BoA's Sale of Notes* [30]

On December 20, 2001, BoA entered into a set of transactions pursuant to which it extended an $80 million loan to Parmalat that was secured by the proceeds of a private placement of notes issued by a Parmalat entity to institutional investors. The transactions were arranged to conceal from Parmalat's innocent managers the true nature of the transaction and use of

**25.** *Id.,* ¶¶ 234–245.

**26.** *Id.,* ¶ 237.

**27.** *Id.,* ¶¶ 246–257.

**28.** *Id.,* ¶ 252.

**29.** *Id.,* ¶ 253.

**30.** *Id.,* ¶¶ 258–270.

the funds. As with some of the other transactions reviewed above, BoA assumed no actual risk but received fees and an interest spread and later foreclosed on the $80 million of collateral.

### 9. Private Placements in General [31]

Finally, BoA placed $1.45 billion of debt in the United States on behalf of various Parmalat entities. "Funds generated from these transactions were funneled to accounts and shell entities controlled by Parmalat corrupt managers for their personal gain." [32] BoA used special purpose vehicles and other offshore entities to conceal the true nature of the transactions and diversion of funds from Parmalat's innocent managers.

### B. Causes of Action

The FAC asserts counts for (4) aiding and abetting breach of fiduciary duty, (11) the federal RICO statutes,[33] (12) the North Carolina RICO Act,[34] and (13) vicarious liability.

### III. The Standard

As a general rule, a court deciding a Rule 12(b)(6) motion accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.[35] Dismissal is inap-propriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [36] Where a complaint alleges fraud, however, the plaintiff is held to a more exacting standard. Rule 9(b) requires that the circumstances constituting fraud be stated with particularity, which means, among other things, that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." [37]

### IV. Threshold Matters

### A. Choice of Law

■ As explained in *Bondi II*,[38] the Judicial Panel on Multidistrict Litigation transferred this action here from the Western District of North Carolina pursuant to Section 1407 of Title 28 of the U.S.Code. In such circumstances, a transferee court in the Second Circuit applies its own interpretation of federal law, not that of the transferor court.[39] To the extent that the action involves issues of state law, this court applies the choice of law rules that would govern in the transferor forum.[40]

---

**31.** *Id.,* ¶¶ 271–275.

**32.** *Id.,* ¶ 272.

**33.** 18 U.S.C. §§ 1961–68.

**34.** N.C. GEN STAT. §§ 75D–1—75D–14.

**35.** *E.g., Flores v. Southern Peru Copper Corp.,* 414 F.3d 233, 237 (2d Cir.2003); *Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001).

**36.** *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (internal quotation marks omitted)).

**37.** *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation marks and citation omitted)); *accord In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69–70 (2d Cir.2001).

**38.** 383 F.Supp.2d at 593.

**39.** *Menowitz v. Brown,* 991 F.2d 36, 40–41 (2d Cir.1993).

The Fourth Circuit recognizes the same rule. *See Bradley v. United States,* 161 F.3d 777, 782 n. 4 (4th Cir.1998).

**40.** *See Van Dusen v. Barrack,* 376 U.S. 612, 638–39, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *Ferens v. John Deere Co.,* 494 U.S. 516, 528–29, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990).

## B. Inconsistency with Original Complaint

■ BoA argues that the Parmalat Debtors are bound by their admissions in the original complaint and that Bondi "may not file an amended complaint that contradicts the factual allegations in the [o]riginal [c]omplaint." [41] This argument is without merit. While prior inconsistent pleadings normally are admissible against a party, they ordinarily are "controvertible, not conclusive" admissions. [42]

## C. Applicability of the In Pari Delicto Defense

■ As before, BoA argues that the Parmalat Debtors' claims are barred by the in pari delicto doctrine, which forecloses recovery by a claimant that was a participant in the alleged wrong. [43] As detailed above, the original complaint made it "quite clear that the Parmalat entities were crucial actors in the [challenged] transactions," which were "the business of, and intended to benefit, Parmalat and not just its agents." [44] Accordingly, both Parmalat's participation in and imputed knowledge of the fraud barred the Parmalat Debtors' recovery, except to the extent that the original complaint alleged that "BoA assisted the insiders in stealing from Parmalat." [45]

BoA argues that the FAC "tells the same basic story" as the original complaint—"Parmalat itself engaged in and received a benefit from the fraud [and] any knowledge possessed by Parmalat insiders must be imputed to the corporation." [46] Bondi counters that the FAC contains no allegations that Parmalat itself participated in the fraudulent transactions and that the insiders' knowledge cannot be imputed to Parmalat because the FAC specifically alleges that they were acting wholly in their own interests and outside the scope of their employment in looting the Company. [47] In other words, Bondi argues that the FAC alleges only that "BoA assisted the insiders in stealing from Parmalat." [48]

The FAC no longer alleges that Parmalat participated in the fraud. It has been revised extensively to emphasize the mastermind role of the corrupt insiders, their entirely self-interested actions, and the subsequent harm done to Parmalat. [49] For example, the FAC alleges that the "corrupt Parmalat managers were acting outside the course and scope of their employment and had totally abandoned the interests of Parmalat when they entered into the transactions designed and executed by [BoA] to conceal their embezzlement." [50] When describing specific transactions, the FAC repeatedly describes the insiders' sole purpose as to benefit themselves at Parmalat's expense. [51]

Accepting these allegations as true, as required on a motion to dismiss, [52] leads to

---

41. BoA Mem. at 9.

42. *The Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387, 395 n. 5 (S.D.N.Y.1988); *see also, e.g., Barris v. Hamilton*, No. 96 Civ. 9541(DAB) 1999 WL 311813, *2 (S.D.N.Y. May 17, 1999).

43. *See Bondi II*, 383 F.Supp.2d at 595–597.

44. *Id.* at 596, 598.

45. *Id.* at 599.

46. BoA Mem. at 10.

47. Bondi Mem. at 11–12.

48. *Bondi II*, 383 F.Supp.2d at 599.

49. *See, e.g.*, FAC, ¶¶ 3, 11, 20, 21, 80, 85, 132, 280, 315.

50. *Id.*, ¶ 3.

51. *E.g., id.*, ¶¶ 80, 88, 118, 132, 160, 187, 253, 272, 277, 280.

52. *E.g., Flores*, 414 F.3d at 237.

the conclusion that when the corrupt insiders worked with BoA to structure the fraudulent transactions and to loot the Company, they were not acting within the scope of their employment. Accordingly, their acts and knowledge cannot be imputed to Parmalat.[53] Since the FAC has eliminated allegations relating to Parmalat's own participation in the fraud, the Parmalat Debtors' claims are not barred by *in pari delicto*.[54] Needless to say, it remains to be seen whether Bondi can prove that transactions that raised millions of dollars for Parmalat served no corporate purpose. But any improbability of such proof may not be considered at this stage.

### V. Sufficiency of the Claims

### A. Counts Eleven and Twelve: Federal and North Carolina RICO

BoA raises a host of arguments why the federal and North Carolina RICO claims should be dismissed. The Court addresses each in turn.

### 1. Whether the Predicate Acts Are Pled with Sufficient Particularity

For Bondi's federal RICO claim, the FAC alleges that BoA committed mail fraud, wire fraud, bank fraud, and money laundering, engaged in transactions with money derived from unlawful activity, traveled in aid of racketeering enterprises, and transported stolen money.[55]

The elements of mail and wire fraud are (1) a scheme to defraud, (2) the use of the United States mails or interstate wires for the purpose of executing the scheme, and (3) a specific intent to defraud.[56] To base RICO liability on the violation of either statute, "the defendant must have made misrepresentations that are material to the harm to the victim" as part of the scheme to defraud.[57] Bondi must demonstrate also "the purpose of the mailing [or wire communication] within the [ ] fraudulent scheme."[58] Moreover, Bondi's allegations must comply with the heightened pleading

---

**53.** *See, e.g., Federal Reserve Bank of Richmond v. Duffy,* 188 S.E. 82, 84, 210 N.C. 598, 600 (N.C.1936) (when an agent is acting on his or her own behalf, and does not act in any official or representative capacity for the corporation, his or her acts and knowledge, under general agency principles applied in the specific context of the corporation, are not imputed) (citations omitted); *accord Sparks v. Union Trust Co. of Shelby,* 124 S.E.2d 365, 368, 256 N.C. 478, 482 (N.C.1962); *Wilson Lumber & Milling Co. v. Atkinson,* 78 S.E. 212, 215, 162 N.C. 298, 301 (N.C.1913); *see also* RESTATEMENT (SECOND) OF AGENCY § 282 ("[a] principal is not affected by the knowledge of an agent in a transaction in which the agent *secretly* is acting adversely to the principal and *entirely* for his own or another's purposes . . . ." (emphases added)).

**54.** BoA argues also that the FAC's RICO claims must fail for lack of reliance because Parmalat participated in the fraudulent transactions or is charged with the insiders' knowledge. *See* BoA Mem. at 10–15. The dismissal of the original complaint's RICO claims was based in part on this reasoning. *See Bondi II,* 383 F.Supp.2d at 604. This argu-

ment fails with regard to the FAC for the same reasons that *in pari delicto* does not apply.

**55.** *See* FAC, ¶¶ 335–356. The allegations other than those pertaining to mail and wire fraud, although more detailed than in the original complaint, still do not specify adequately acts by BoA. *See Bondi II,* 383 F.Supp.2d at 604. In substance, they continue to state only that BoA violated a series of statutes. *See* FAC, ¶¶ 336–338, 347–350. "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). These allegations are insufficient, and Bondi did not attempt to argue otherwise in his memorandum of law. *See* Bondi Mem. at 12–21.

**56.** *See* 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud).

**57.** *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 169 (2d Cir.1999).

**58.** *McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992).

standard of Federal Rule of Civil Procedure 9(b).[59]

Bondi's theory is that the transactions structured by the Bank to conceal and facilitate the corrupt insiders' looting were the fraudulent scheme and that the mail and wire systems were used at various times as part of that scheme.[60] Having set up that premise, Bondi goes one step further, offering the transactions as not just the scheme, but also as the affirmative misrepresentations that made the scheme fraudulent.[61]

■ The problem with this approach is that a transaction is a transaction, not a communication. Fraudulent statements or material omissions may be made in describing a transaction, but the transaction itself is not a statement or an omission. Bondi has no authority for the proposition that transactions may serve as misrepresentations in the RICO context, relying instead on two cases brought under the federal securities laws.[62] Permitting the Parmalat Debtors to characterize transactions as misrepresentations would broaden civil RICO liability considerably. For example, a plaintiff could describe an omission by a defendant as an act or transaction, and thus bring a claim without alleging the necessary duty to disclose. The Court declines to expand RICO liability in this manner.

Bondi argues in the alternative that the FAC alleges numerous affirmative misrepresentations.[63] To meet the requirements of Rule 9(b), however, the FAC must "specify the statements [Bondi] claims were false or misleading, give particulars as to the respect in which [he] contend[s] the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements."[64] With one exception, the FAC's allegations do not meet this standard: the descriptions of the transactions and BoA's conduct generally do not identify any actual representations by BoA, allegedly false or otherwise.[65] In those few instances where a misrepresentation is identified, the other requisite details are missing.[66] The exception is the set of allegations relating to the December 20, 1999 press release issued by Parmalat insiders at BoA's direction.[67] The FAC alleges adequately that the press release contained specific misrepresentations that

> "the Brazilian unit had 'increased its share capital in favor of a group of North American investors led by [BoA]' and that 'the new shareholders will own slightly over 18 percent of the Brazilian company's share capital.' The deal, the release said, valued the subsidiary at about $1.35 billion, or more than two-thirds of Parmalat's total market value at the time."[68]

---

59. *See, e.g., id.*

60. *See, e.g.,* FAC, ¶¶ 80, 83.

61. *See id.; see also* Bondi Mem. at 13–15.

62. *See* Bondi Mem. at 13–15.

63. *See* Bondi Mem. at App. A.

64. *McLaughlin,* 962 F.2d at 191.

65. *See generally* FAC; Bondi Mem. at App. A. For example, Bondi argues that paragraphs 90–92, 95–97, and 105–107 contain three affirmative misrepresentations by BoA. *See* Bondi Mem. at App. A. The gist of those

paragraphs is that BoA set up a $60 million loan for Parmalat Argentina, arranged for secret terms giving itself a higher interest rate and fees, arranged for a private placement by Parmalat Trust to pay off the loan, and received kickbacks through insurance premiums. Nowhere is a misrepresentation by BoA identified.

66. *E.g.,* FAC, ¶ 84 (unclear who characterized kickbacks as "insurance premiums" or "interest rate swap advances").

67. *See id.,* ¶¶ 213–221.

68. *Id.,* ¶ 216.

Accordingly, with the exception of those press release allegations, the FAC fails to state a claim for mail and wire fraud based upon affirmative misrepresentations.

■ Finally, Bondi argues that the FAC adequately alleges that BoA made material omissions as part of its scheme to defraud.[69] If a defendant has a duty to disclose, material omissions are actionable as fraud.[70] A duty to disclose may arise when the parties stand in a fiduciary or other relationship of trust and confidence.[71] Here, the FAC alleges that BoA was Parmalat's financial advisor and the managing agent for Eurofood, a Parmalat subsidiary.[72] Although BoA argues that the characterization is incorrect, at this stage the allegations must be accepted as true, and so Bondi has alleged the existence of BoA's duty to disclose.

Moving to the alleged omissions, the overall tenor of the FAC is that BoA generally kept quiet about the true state of Parmalat's affairs and deliberately did not tell the innocent insiders about the corrupt insiders' looting campaign or the transactions which made the thefts possible.[73] But Rule 9(b) requires Bondi to allege specific omissions with particularity.[74] Despite Bondi's assertion that the FAC describes BoA's omissions "chapter and verse," few specific omissions are described.[75] The two that do possess the requisite level of detail are the allegations that BoA failed to disclose (1) the true interest rate of the December 1996 loan to Parmalat Argentina,[76] and (2) BoA's real exposure in the December 1997 Parmalat Venezuela transaction.[77] Accordingly, the RICO claim based on those two alleged omissions, if otherwise sufficient, survives.

### 2. Lack of Causation

■ A RICO plaintiff must show that the racketeering activity or individual predicate acts were the but-for and proximate cause of its direct injury.[78] Bondi must allege both transaction causation, meaning that the predicate acts led Parmalat to enter into the transactions at issue, and loss causation, meaning that the predicate acts were the "reason the transaction[s] turned out to be … losing ones." [79]

Here, the FAC alleges that BoA's material omissions lulled Parmalat's innocent

---

69. *See* Bondi Mem. at 15–19.

70. *See, e.g., United States v. Autuori*, 212 F.3d 105, 118 (2d Cir.2000).

71. *Id.* at 119.

72. *See* FAC, ¶¶ 330 ("For a period of eight years or more, from 1996 until 2003, [BoA] served as Parmalat's financial advisor arranging over $1.7 billion in financing."), 288.

73. *See generally* FAC.

74. *See McLaughlin*, 962 F.2d at 191.

75. Bondi Mem. at 17. For example, Bondi claims that paragraph 171 alleges that BoA failed to disclose the true interest rate it was charging. *Id.* Paragraph 171 reads: "The true interest rate (again, disguised by side letters) was over 10%, reflecting [that] [BoA]'s internal assessment of Parmalat's financial condition was far worse than what was being publicly reported." This paragraph does not allege that BoA failed to disclose the 10% interest rate; all that is alleged is that the true interest rate was disguised by side letters. It does not state to whom or by whom the side letters were sent, or when, or from whom the interest rate was disguised. This does not meet Rule 9(b)'s particularity standard.

76. *See* FAC, ¶¶ 90–91.

77. *See id.,* ¶ 117.

78. *See, e.g., Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir.2003); *First Capital Asset Management, Inc. v. Brickellbush, Inc.*, 218 F.Supp.2d 369, 379 (S.D.N.Y.2002).

79. *Moore*, 189 F.3d at 172 (internal citations omitted); *see also, e.g., Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F.Supp.2d 282, 302–03 (S.D.N.Y.2000).

insiders into a false sense of security in the health of the Company. Without being told the true state of affairs, the innocent insiders relied on the mirage and did not act to investigate further; had they been told the truth, they would have halted the fraud and theft.[80] Thus the FAC adequately alleges both transaction causation (BoA's omissions led to the innocent managers' inaction) and loss causation (the managers' inactivity, prompted by BoA's silence, permitted the looting to continue). The omissions are alleged to have been "a substantial factor in the chain of causation that led to [the Parmalat Debtors'] losses."[81] That is sufficient at the pleading stage.[82]

### 3. Conduct of the Enterprise's Affairs

■ Bondi's federal RICO claim is brought under 18 U.S.C. § 1964(c), which provides a civil remedy for any person "injured in his business or property by reason of a violation of" 18 U.S.C. § 1962. Bondi alleges that BoA violated 18 U.S.C. § 1962(c), which states:

> "It shall be unlawful for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

A RICO plaintiff must allege that the defendant "participated in the operation or management of the enterprise itself."[83]

BoA argues that the FAC does not allege adequately that the Bank participated in the operation or management of the alleged enterprise, which is defined as Parmalat Finanziaria SpA, Parmalat SpA, Parmalat Capital Finance, Eurofood, FHL/DHL, and their subsidiary and affiliated companies.[84] Instead, BoA contends that the primary RICO violators here were the corrupt insiders, and that BoA at worst aided and abetted the insiders' scheme.

■ In this Circuit, the " 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage."[85] Here, the FAC alleges that BoA operated and controlled the enterprise by structuring the sham transactions, working with the corrupt insiders, and exerting its influence over Eurofood, FHL, and DHL, which were part of the alleged enterprise.[86] Under the Second Circuit's formulation of the standard, these allegations are sufficient to show that BoA "played 'some part in directing the enterprise's affairs.' "[87] The Court therefore does not reach the issue of the viability of aiding and abetting liability under RICO.[88]

80.  See, e.g., FAC, ¶¶ 88, 91, 118, 277, 286–86, 328, 331–33.

81.  Lerner, 318 F.3d at 123.

82.  BoA's argument that the insider looting was an intervening cause of the Company's losses is without merit. The FAC alleges that Parmalat was the target of the looting scheme, and so it was both an intended and foreseeable victim. See, e.g., Jund v. Town of Hempstead, 941 F.2d 1271, 1286 (2d Cir. 1991).

83.  Reves v. Ernst & Young, 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

84.  See FAC, ¶ 358.

85.  First Cap. Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir.2004) (internal citations omitted).

86.  See FAC, ¶¶ 367

87.  Satinwood, 385 F.3d at 176 (internal citations omitted) (emphasis in original).

88.  As Bondi has alleged adequately substantive violations of RICO, as described above, his RICO conspiracy claim under 18 U.S.C. § 1964(d) survives to that extent as well. Cf. Brickellbush, 219 F.Supp.2d at 588.

### 4. Additional North Carolina RICO Claim Issues

As the North Carolina RICO statute is quite similar to the federal one[89] and the FAC's allegations for the state law claim track the federal allegations, the above analysis of the FAC's allegations applies to the state law claim as well. BoA makes two additional arguments against this claim.

First, BoA argues the claim must be dismissed because the North Carolina statute allows only an "innocent person" to recover,[90] and *Bondi II* held that Parmalat is not an innocent person.[91] BoA misconstrues *Bondi II*. The holding that Parmalat was not an innocent person was grounded in the original complaint's allegations that Parmalat both participated in the fraud itself and was charged with the corrupt insiders' knowledge.[92] As the FAC alleges that Parmalat did not participate in the fraud and that the insiders were acting solely in their own interests and outside the scope of their employment, Parmalat is an innocent person for the purposes of the statute.[93]

Second, BoA argues that the North Carolina statute is intended to apply only where the proscribed conduct affects the economy of North Carolina and the sought remedy would impart a direct monetary benefit to that economy. While the statute codifies a statement of legislative purpose to address "organized unlawful activity [ ] being directed to and against the legitimate economy of the State,"[94] the provisions setting forth the cause of action itself do not give effect to that purpose by imposing explicit requirements as part of the cause of action.[95] BoA does not cite, and the Court did not find, any North Carolina case law requiring a state RICO plaintiff to allege that the defendant's proscribed conduct or the plaintiff's sought remedy would have any relationship to the North Carolina economy.

### B. Count Thirteen: Vicarious Liability

Bondi added a claim for vicarious liability under federal and North Carolina law to the FAC, but acknowledges in his memorandum of law that the claim is "asserted under RICO."[96] Vicarious liability is a theory of liability, in this case under RICO, not a separate cause of action.[97] Count Thirteen is therefore dismissed as redundant of Counts Eleven and Twelve.

### VI. Conclusion

BoA's motion to dismiss is granted to the extent that Count Thirteen is dismissed and Counts Eleven and Twelve are dismissed except to the extent they are based on the misrepresentations and omis-

---

89. *Compare* N.C. Gen.Stat. §§ 75D–1—75D–14 (2005) *with* 18 U.S.C. §§ 1961–1968 (2005).

90. N.C. Gen.Stat. § 75D–8(c).

91. *See Bondi II*, 383 F.Supp.2d at 604.

92. *See id.*

93. Although BoA's argument is ultimately misplaced, Bondi mischaracterizes *Kaplan v. Prolife Action League of Greensboro*, 475 S.E.2d 247, 254 n. 3, 123 N.C.App. 720, 729 n. 3 (N.C.Ct.App.1996) as holding that the " 'innocent' person language in the state statute creates 'no legally significant distinction' with the absence of that term in the federal RICO statute." The *Kaplan* court did not analyze the "innocent person" language. *See id.*

94. N.C. Gen.Stat. § 75D–2(a).

95. *See* N.C. Gen.Stat. §§ 75D–3, 75D–4.

96. Bondi Mem. at 29.

97. *See, e.g., Amendolare v. Schenkers Int'l Forwarders, Inc.*, 747 F.Supp. 162, 168 (E.D.N.Y. 1990); *Berkeley Fed. Sav. & Loan Ass'n v. Terra Del Sol, Inc.*, 433 S.E.2d 449, 457–58, 111 N.C.App. 692, 708 (N.C.Ct.App.1993).

sions alleged in paragraphs 91–92, 117, and 213–221 of the FAC. The motion is otherwise denied.

SO ORDERED.